**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| LASHELL EPPERSON, GEORGE HENGLE, SHERRY BLACKBURN, CLAIRMONT MORRISON, EQUILLA LAVINE and SEMETRICA SHADWICK, *individually and on behalf of others similarly situated*, <br><br> Plaintiffs, <br><br>  v. <br><br> RODNEY M. BORDEAUX, VICE CHAIRMAN OF THE BOARD OF DIRECTORS FOR REDCO AND PRESIDENT OF THE ROSEBUD SIOUX TRIBE, *in his official capacities*; WAYNE BOYD, CHAIRMAN OF THE BOARD OF DIRECTORS FOR REDCO AND SECRETARY OF THE ROSEBUD SIOUX TRIBE, *in his official capacities*; WIZIPAN LITTLE ELK, *in his individual capacity*; CLAY COLOMBE, *in his individual capacity*; MINDI VAVRA, *in her individual capacity*; FINTECH FINANCIAL, LLC; and JOHN DOES NOS. 1-30. <br><br> Defendants. | Civil Action No. 3:19-cv-939 |

**CLASS ACTION COMPLAINT**

COME NOW Plaintiffs, Lashell Epperson, George Hengle, Sherry Blackburn, Clairmont Morrison, Equilla Lavine, and Semetrica Shadwick, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

**GENERAL ALLEGATIONS**

1. This is a case about the making of and collecting on unlawful loans in the Commonwealth of Virginia by an unconventional lender: Rosebud Lending, a predatory lender

1

formed by the Rosebud Economic Development Corporation (REDCO), the economic development arm of the Rosebud Sioux Tribe, a federally recognized Native American tribe. These loans carry triple-digit interest rates as high as 790% and are illegal.

2.     These loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.     "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013). In recent history, many states have enacted laws to protect their most vulnerable consumers from modern-day predatory lending practices. Commonly, these state laws will cap the amount of interest a lender is allowed to pay and/or require lenders to be licensed in the state where the consumer is located. These laws not only protect vulnerable borrowers, but they also promote the "common good" as usury "weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018).

4.     Rosebud Lending, which holds itself out as an economic development arm and instrumentality of the Rosebud Sioux Tribe, has made and collected on illegal loans across the country under several different names, including Advance Me Today, 1800899Cash, First Pay Loans, My Quick Wallet, Zoca Loans, Pixy Cash, QCredit, Big Star Credit, Arrow Financial, and Arrow Credit. Upon information and belief, Rosebud Lending is organized under the laws of the Rosebud Sioux Tribe for the dual purposes of avoiding state and federal laws and shielding non-tribal participants in the enterprise from liability.

2

5.      Although the Rosebud Sioux Tribe may in part be motivated by its intention of advancing its own community, the Tribe's effort to advance themselves exploits desperately poor people in other communities who, in their moment of despair, agree to take a small dollar loan with triple-digit interest rates. The 790% annual interest rate used by Rosebud Lending is more than 65 times the legal rate permitted under Virginia law. But Virginia, like any other government, has a vital interest in protecting its residents. By entering Virginia to make loans to Virginia consumers and collect from their Virginia bank accounts, the Rosebud Sioux Tribe has knowingly violated applicable Virginia and federal law because it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973).

6.      This case seeks prospective relief against the Rosebud Sioux Tribal Council, who claim to oversee and control all aspects of its illegal lending business. Although the tribal lending companies claim that they are entitled to immunity, the Supreme Court has held that "tribal immunity does not bar" a "suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). An official capacity suit for prospective relief is one of "the panoply of tools" that can be used to "shutter, quickly and permanently, an illegal" practice even though sovereign immunity otherwise prevents recovery of damages from the tribe or its economic subsidiary. *Id.*

7.      This lawsuit also seeks to hold Defendants Wizipan Little Elk, Clay Colombe, and Mindi Vavra personally liable for their violations of RICO in their individual capacities. Government employees "'sued in their personal capacity come to court as individuals,'" and, thus, "immunity is simply not in play." *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) (quoting *Hafer v.*

3

*Melo*, 502 U.S. 21, 27 (1991)). Because of their participation in the operation and management of the enterprise, as well as their facilitation of the conspiracy to collect unlawful debt from consumers, Defendants Wizipan Little Elk, Clay Colombe, and Mindi Vavra are jointly and severally liable in their individual capacities for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

8.     Plaintiffs also seek relief from Fintech Financial who provided the capital used to make the high-interest loans to consumers through the enterprise and, in return, generated large profits from its investment in the scheme. This lawsuit seeks to hold Fintech Financial and others not yet known to Plaintiff liable for their violations of Virginia and federal laws in the collection of loans with usurious interest rates. Based on Fintech Financial's conduct, Plaintiffs allege violations of RICO. Fintech Financial received millions of dollars derived from the collection of unlawful debt. Further, Fintech Financial acquired and maintained interests in the enterprise and was aware of the scheme to repeatedly violate state lending statutes resulting in the collection of an unlawful debt from Plaintiffs and the class members. Fintech Financial's acts described herein are unlawful as set forth in RICO. Plaintiffs also assert a class claim for violations of Virginia's usury and licensing laws. Because the enterprise's loan exceeded the annual percentage rate and licensing requirements required by Virginia law, such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. Va. Code 6.2 § 1541(A).

## JURISDICTION AND VENUE

9.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

10.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Virginia consumers. As part of their scheme, Defendants solicited Virginia consumers, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

11.    Plaintiff Lashell Epperson is a natural person residing in Virginia.

12.    George Hengle is a natural person residing in this District and Division.

13.    Sherry Blackburn is a natural person residing in this District and Division.

14.    Clairmont Morrison is a natural person residing in Leesburg, Virginia.

15.    Equilla Lavine is a natural person residing in Ashburn, Virginia.

16.    Semetrica Shadwick is a natural person residing in this District and Division.

17.    Defendant Rodney M. Bordeaux is the President of the Rosebud Sioux Tribe. The President of the Rosebud Sioux Tribe has the authority to supervise all tribal employees. Rosebud Sioux Const. Rosebud Sioux By-Laws art. 1, § 1. Plaintiffs seek relief from Defendant Bordeaux in his official capacity as President of the Rosebud Sioux Tribe.

18.    Defendant Rodney M. Bordeaux is also the Vice Chairman of the REDCO Board of Directors. Plaintiffs also seek relief from Defendant Bordeaux in his official capacity as Vice Chairman of the REDCO Board of Directors.

19.    Defendant Wayne Boyd is the Secretary of the Rosebud Sioux Tribe. Plaintiffs seek

relief from him in his official capacity as Secretary of the Rosebud Sioux Tribe.

20.    Defendant Wayne Boyd is also the Chairman of REDCO. Plaintiffs seek relief from him in his official capacity as Chairman of REDCO.

21.    Defendant Wizipan Little Elk is the Chief Executive Officer of Rosebud Economic Development Corporation ("REDCO"). REDCO controls Rosebud Lending as its wholly owned subsidiary. Plaintiffs seek relief from Defendant Wizipan Little Elk in his individual capacity.

22.    Defendant Clay Colombe is the Chief Financial Officer of REDCO. He oversees Rosebud Lending. Plaintiffs seek relief from Defendant Clay Colombe in his individual capacity.

23.    Defendant Mindi Vavra is the Rosebud Lending General Manager. She has worked for REDCO since 2012. During this time, , Mindi Vavra has also served as the Chief Risk Officer for Fintech Financial, LLC, a Delaware company that is a party to the conspiracy to make and collect on illegal loans. Plaintiffs seek relief from Defendant Mindi Vavra in her individual capacity.

24.    Fintech Financial, LLC, is a Delaware company that played an integral role in the lending enterprise by providing capital to help fund millions of dollars of illegal loans made to consumers. The enterprise used the money from Fintech Financial to make the illegal loans to consumers, and in return, the enterprise returned profits to Fintech Financial.

25.    Defendant John Doe Nos. 1-30 are unidentified parties who participated in the enterprise with the named Defendants.

## BACKGROUND

**A.    Virginia law protects Virginia consumers from unlicensed and predatory lending.**

26.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg.*

*& Inv. Corp.*, 226 Va. 596, 601 (1984).[1] The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

27.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders.

28.     Rosebud Lending and its subsidiaries were not licensed to make loans in Virginia.

29.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void."  Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void."). This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious."  Va. Code. § 6.2-1541(C).

30.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made."  Va. Code § 6.2-1541(A)-(B).

---

[1] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."  Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012).

**B.    The development of the tribal lending model to avoid applicable law.**

31.    In recent years, predatory lenders have concocted various schemes in an attempt to make high-interest loans over the internet while evading state usury laws.

32.    In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

33.    Federal banking regulators shut down these rent-a-bank schemes. Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

34.    In response to the shut-down of the rent-a-bank scheme, several predatory lenders turned to a tribal lending model to facilitate their illegal lending businesses. Using this model, the predatory lender—which does most of its lending over the internet—affiliates with a Native American tribe to insulate itself from federal and state law by purporting to piggy-back on the tribe's sovereign legal status and its general immunity from suit under federal and state laws.

35.    The predatory lenders then cite tribal immunity to support their dubious claims that no federal or state laws apply to their business. Specifically, they argue that, because their businesses are located on a Native American reservation or are affiliated with a Native American tribe, they are bound by the laws of that reservation or tribe only, not applicable federal and state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 759 (2012).

36.     Like its predecessor, this scheme is highly problematic for a number of reasons. For starters, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. By extension, the business does not occur on tribal lands but instead occurs in the state where the consumer is located. And, it is settled law that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Jones*, 411 U.S. at 148–49.

37.     In recent years, these tribal lending schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles.[2]

**C.     Defendants and others established the enterprise to avoid usury and licensing laws.**

38.     Upon information and belief, Defendants and others established Rosebud Lending in or around 2012 and began making and collecting on usurious loans.

39.     Upon information and belief, the establishment of Rosebud Lending by REDCO and others was prompted in part by the government crackdown on illegal lending businesses in 2008-2011.

40.     Upon information and belief, REDCO and the Rosebud Sioux Tribe have joined one or more association in fact enterprises with individuals outside of the tribe and non-tribal investors to collect on usurious loans throughout the country.

---

[2] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

41.     Defendants and others agreed to establish the illegal lending businesses in order to make and collect on illegal loans in violation of state usury and licensing requirements.

42.     Rosebud Lending makes and collects on usurious loans under various names, including Advance Me Today (Advancemetoday.com); 1800899Cash (1800899Cash.com); First Pay Loans (FirstPayLoans.com); My Quick Wallet (MyQuickWallet.com); Zoca Loans (ZocaLoans.com); Pixy Cash (pixycash.com); QCredit (QCredit.com); Big Star Credit (bigstarcredit.com); Arrow Financial; and Arrow Credit (ArrowCredit.com).

43.     Advance Me Today and 1800899Cash existed prior to Rosebud Lending, and upon information and belief, the Rosebud Sioux Tribal Council and REDCO agreed to facilitate the pre-existing illegal lending business to shield nontribal participants from liability.

44.     Upon information and belief, the vast majority of the profits made under the names Advance Me Today and 1800899Cash did not go to the Rosebud Sioux or REDCO but instead went to nontribal outsiders who paid for the affiliation with the Rosebud Sioux to protect themselves from liability of their violations of state and federal laws.

45.     Rosebud Lending also entered into agreements to make and collect on loans at usurious interest rates with Fintech Financial, a Delaware company.

46.     Upon information and belief, the Rosebod Sioux Tribal Council, REDCO, Rosebud Lending, Wizipan Little Elk, Mindi Vavra, and Fintech Financial agreed that Rosebud Lending would use money provided by Fintech to make consumer loans using excessive interest rates far in excess of the amount required by state law.

47.     Fintech Financial exerted significant control over the lending business. Fintech's control over Rosebud Lending including a security interest in the bank account used to make loans under Rosebud Lending's subsidiary "Rosebud Lending RQC." Further, upon information and

belief, Fintech Financial designated the states in which Rosebud Lending was permitted to lend in and the interest rates it was permitted to charge.

48.     Upon information and belief, the vast majority of the profits from the loans made in partnership with Fintech Financial did not go to Rosebud Lending, REDCO, or the Rosebud Sioux Tribe.

49.     Instead, the excessive profits went to Fintech Financial and others not yet known to Plaintiffs.

50.     Upon information and belief, Rosebud Lending also entered into agreements with Think Finance and Microbilt to make loans at usurious interest rates. For example, the domain name QCredit.com was registered for Robert Franklin at Think Finance using a MicroBilt email.

51.     Upon information and belief, Rosebud Lending also entered into agreements with 777 Partners, LLC, a Miami private investment firm to make and collect on usurious loans under the name Zoca Loans.

52.     Upon information and belief, Josh Wander, a founding and managing partner of 777 Partners, helped develop the illegal lending business, including negotiating the agreement between REDCO and 777 Partners and registering the domain name for Zoca Loans.

53.     Upon information and belief, Wizipan Little Elk and Mindi Vavra were instrumental in developing the illegal lending business and each agreed to the collection of unlawful debt.

54.     Mindi Vavra was the Chief Risk Officer at Fintech Financial and agreed that the enterprise would engage in the collection of unlawful debt. Upon information and belief, Mindi Vavra is still associated with Fintech Financial.

55.    Mindi Vavra works at Rosebud Lending and is responsible for managing Rosebud Lending. She registered the domain name for BigStarCredit.com.

56.    Upon information and belief, Rosebud Lending, REDCO, and the Rosebud Sioux Tribal Council's role in the illegal lending business is to provide a front to non-tribal outsiders who wish to make and collect on illegal loans across the country.

57.    Upon information and belief, the majority of the operations of the illegal lending business take place off of tribal lands and are performed by third parties.

58.    For example, in response to a "pattern of complaints" from consumers that Rosebud Lending engages in abusive collection activity, including deducting more than is required from consumers' bank accounts, Rosebud Lending has represented to the Better Business Bureau that most of Rosebud Lending's call center needs are performed by third party call centers.[3]

59.    Rosebud Lending is the consumer lending arm of REDCO, and upon information and belief, is a wholly owned subsidiary of REDCO.

60.    The Rosebud Sioux Tribal Council established REDCO in 1999 as the economic arm of the Tribe.

61.    REDCO is a separately chartered arm and entity of the Rosebud Sioux Tribe. REDCO is owned by the Rosebud Sioux Tribe but is governed by an independent board of directors.

62.    Upon information and belief, the Chairman and Vice Chairman of the REDCO Board of Directors agreed to the collection of unlawful debt by Rosebud Lending.

---

[3] Rosebud Lending, Better Business Bureau, https://www.bbb.org/us/sd/mission/profile/payday-loans/rosebud-lending-0714-300106660/details (last visited Nov. 4, 2019).

63.     Upon information and belief, the Chairman and Vice Chairman of the REDCO Board of Directors agreed to establish Rosebud Lending to facilitate the enterprise's collection of unlawful debt.

64.     Upon information and belief, the Rosebud Sioux Tribal Council, the Rosebud Sioux President, and the REDCO governing board has the authority to shut down the operations of Rosebud Lending.

65.     Upon information and belief, Rosebud Lending continues to make and collect on illegal loans in Virginia because REDCO and the Rosebud Sioux Tribal Council allows it to do so.

66.     Additionally, upon information and belief, Defendants Wizipan Little Elk, Clay Colombe, and Mindi Vavra have been instrumental in furthering the illegal lending enterprise and various operating names.

67.     Upon information and belief, as CEO of REDCO, Defendant Wizipan Little Elk has engaged in the operation and management of the enterprise involved in the collection of unlawful debt.

68.     As the CFO and VP of Financial Services at REDCO, Defendant Clay Colombe oversees Rosebud Lending and, upon information and belief, has engaged in the operation and management of the enterprise involved in the collection of unlawful debt.

69.     Upon information and belief, as the Manager of Rosebud Lending General, Mindi Vavra has engaged in the operation and management of the enterprise involved in the collection of unlawful debt.

70.     Without Defendants participation in the enterprise, Plaintiffs loans never would have been made and collected on.

71.     For each operating name Rosebud Lending does business under, it has a separate website with a disclaimer such as the following:

> Rosebud Lending LZO is the tribal lending agency of Rosebud Lending, a subsidiary of the Rosebud Economic Development Corporation, an economic development arm and entity of the Rosebud Sioux Tribe, a sovereign nation located within the United States of America and operating within the Tribe's reservation. Rosebud Lending does business as ZocaLoans.

72.     However, even though the above disclaimer suggests that Rosebud Lending operates within the Tribe's reservation, upon information and belief, very little, if any, of the operations of Rosebud Lending take place on the reservation.

**D.      Defendants made and collected on usurious loans to Virginia consumers.**

73.      Defendants, together with Think Finance, MicroBilt, 777 Partners, and others not yet known to Plaintiffs, marketed, initiated, and collected usurious loans throughout the country, including in Virginia.

74.     Defendants knew the subject loans were illegal under Virginia's usury and licensing laws, but they pursued the scheme anyway, misrepresenting that the lenders were operating within the Tribe's reservation and were wholly owned and operated by the Rosebud Sioux.

75.     Because of the ostensible protections created by the tribal business model, the interest rates charged on the loans were more than 40 to 60 times the amount permitted by Virginia's usury and licensing laws.

76.     For example, Plaintiff Lashell Epperson applied for and received two Rosebud Lending loans from a personal electronic device while located in Virginia.

77.     Ms. Epperson used her Virginia address when applying for the loan, and she used her Virginia bank account to receive the loan and for the subsequent ACH debits to pay the loan.

78.     Ms. Epperson's loans used annual percentage rates 792.81% and 693.10%.

79.     Defendants, together with others in the lending enterprise, received no less than $1,152.44 from Ms. Epperson in connection with the illegal loan issued to her by Rosebud Lending doing business as ZocaLoans.

80.     Plaintiff Blackburn applied for and received a Rosebud Lending loan from a personal electronic device while she was located in Virginia.

81.     Ms. Blackburn used her Virginia address when applying for the loans, and she used her Virginia bank account to receive the loans and for the subsequent ACH debits to pay the loans.

82.     Ms. Blackburn's Rosebud Lending loan used an annual percentage rate of 796.55%.

83.     Defendants, together with others in the lending enterprise, received no less than $557.24 from Ms. Blackburn in connection with the illegal loan.

84.     Plaintiff George Hengle applied for and received a Rosebud Lending loan from a personal electronic device from an IP address in Richmond, Virginia.

85.     Mr. Hengle used his Virginia address when applying for the loan, and he used his Virginia bank account to receive the loan and for the subsequent ACH debits to pay the loan.

86.     Mr. Hengle's loan used an annual percentage rate of 792.83%.

87.     Mr. Rose used his Virginia address when applying for the loan, and he used his Virginia bank account to receive the loan and for the subsequent ACH debits to pay the loan.

88.     Ms. Rose's loan was for $500 and used an annual percentage rate of 742.96%.

89.     Defendants, together with others in the lending enterprise, received no less than $1,337.21 from Mr. Rose in connection with the illegal loan issued to him by Rosebud Lending.

90.     Plaintiff Clairmont Morrison applied for and received two Rosebud Lending loans from a personal electronic device while located in Virginia.

91.    Mr. Morrison used his Virginia address when applying for the loan, and he used his Virginia bank account to receive the loan and for the subsequent ACH debits to pay down the loan.

92.    Mr. Morrison's loans were for $500 and $600 and used annual percentage rates of 680.62% and 493.64%.

93.    Defendants, together with others in the lending enterprise, received no less than $4,919.47 from Mr. Morrison in connection with the illegal loan issued to him by Rosebud Lending.

94.    Plaintiff Semetra Shadwick applied for and received a Rosebud Lending loan from a personal electronic device while located in Virginia.

95.    Ms. Shadwick used her Virginia address when applying for the loan, and she used her Virginia bank account to receive the loan and for the subsequent ACH debits to pay the loan.

96.    Ms. Shadwick's loan used an annual percentage rate far in excess of 12%.

97.    Defendants, together with others in the lending enterprise, received no less than $486.85 from Ms. Shadwick in connection with the illegal loan issued to her by Rosebud Lending.

98.    Plaintiff Equella Lavine applied for and received a Rosebud Lending loan from a personal electronic device while located in Virginia from an IP address in Virginia.

99.    Ms. Lavine used her Virginia address when applying for the loan, and she used her Virginia bank account to receive the loan and for the subsequent ACH debits to pay the loan.

100.    Ms. Lavine's loan was for $800 and used an annual percentage rate of 693.09%.

101.    Defendants, together with others in the illegal lending enterprise, received no less than $2,000 from Ms. Lavine in connection with the illegal loan issued to her by Rosebud Lending.

102.    Upon information and belief and as evidenced by each of the loans made to Plaintiffs, all of Defendants' loans to consumers located in Virginia contained interest rates over 12% per year even though Defendants did not obtain a consumer finance license.

103.    Accordingly, the loans were null and void and it is unlawful for Defendants or any their affiliated entities to collect or receive any principal, interest or charges whatsoever on said loans, including the amounts paid by each of Plaintiffs.

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs assert claims on behalf of the proposed RICO Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Rosebud Lending or any of its subsidiaries.*

105.    Plaintiffs also assert claims on behalf of the proposed Declaratory Judgment Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Rosebud Lending or any of its subsidiaries and who have outstanding balances on the loans.*

106.    Plaintiffs also assert claims on behalf of the proposed Injunctive Relief Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Rosebud Lending or any of its subsidiaries and who have outstanding balances on the loans.*

107.    Plaintiffs also assert claims on behalf of the proposed Virginia Usury Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Rosebud Lending or any of its subsidiaries and who made a payment on the loan.*

**Numerosity**

108.    At this time, Plaintiffs do not know the exact number of members of the Classes. However, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

**Commonality**

109.    There are numerous common questions of law and fact common to Plaintiffs and members of the Classes. These questions include but are not limited to the following:

    a.    Whether the Defendants, REDCO, Rosebud Lending, 777 Partners, MicroBilt, Think Finance, other non-tribal participants, and non-tribal investors, constitute an "enterprise" under RICO;

    b.    Whether Defendants conducted the affairs or participated in the enterprise's affairs;

    c.    Whether Defendants violated RICO by collecting on the loans;

    d.    Whether Defendants were part of a conspiracy to collect unlawful debt in violation of RICO;

    e.    Whether the loans were unlawful debts as defined by RICO;

    f.    The appropriate amount of damages to award each Plaintiff and class members, including whether to impose treble damages on Defendants; and

    g.    Whether injunctive and declaratory relief is appropriate.

**Typicality**

110.    Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out a usurious Rosebud Lending loan. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

111.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating similar online and tribal lending cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Classes.

**Injunctive Relief**

112.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for defendants.

**Predominance and Superiority**

113.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

   a.    Absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations will continue without remedy; and

additional consumers will be harmed.

b.   It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.   A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.   The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.   Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(c)-(d)
### (On behalf of all Plaintiffs and the RICO Class)
(Rodney M. Bordeaux, *in his official capacities* as President of the Rosebud Sioux Tribe and Vice-Chairman of the REDCO Board of Directors; Wayne Boyd, *in his official capacities* as Secretary of the Rosebud Sioux Tribe and Chairman of the REDCO Board of Directors)

114.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

115.   Plaintiffs seek relief from Defendant Rodney M. Bordeaux only in his official capacities as President of the Rosebud Sioux and Vice-Chairman of the REDCO Board of Directors.

116.   Plaintiffs seek relief from Defendant Wayne Boyd only in his official capacities as Secretary of the Rosebud Sioux Tribe and Chairman of the REDCO Board of Directors.

117.   Each of Defendants is a "person" as that term is defined in 18 U.S.C. § 1964(3).

118.   The Enterprise, consisting of the Defendants; non-tribal participants (such as 777 Partners, Think Finance, MicroBilt, and Fintech Financial); and non-tribal investors are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of

profiting off of the collection on unlawful debt by offering and collecting on loans to consumers through the online lender Rosebud Lending.

119.    The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

120.    Defendants Rodney M. Bordeaux and Wayne Boyd violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

121.    Without their participation in the establishment of Rosebud Lending, the unlawful debts would have never been collected in Virginia.

122.    The REDCO Board of Directors and the Rosebud Sioux Tribal Council's, including Defendants Rodney M. Bordeaux and Wayne Boyd, continued permitting of Rosebud Lending's operations, including the lending and collecting in the name of the Rosebud Sioux was an action that would induce the payment of debts by consumers. Further, the facilitation of the claim that no state or federal law applies to the loans and that only Tribal law applies was also an action that would induce the payment of debts by consumers.

123.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

124.    All of the loans made to RICO Class members and collected by Defendants, Rosebud Lending, and others included interest rates far in excess of twice the enforceable rate in Virginia.

125.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants Rodney M. Bordeaux's and Wayne Boyd's violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

126.    This conduct began sometime as early as 2013, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

127.    Defendants Rodney M. Bordeaux and Wayne Boyd also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Both Defendants Rodney M. Bordeaux and Wayne Boyd knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect on unlawful debt at more than twice the lawful rate of interest under state usury laws.

128.    Both Defendants Rodney M. Bordeaux and Wayne Boyd understood and agreed that the enterprise was to engage in the collection of unlawful debt.

129.    Plaintiffs and the RICO Class members were injured as a direct result of the their violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

130.    This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

131.    Plaintiffs seek prospective injunctive and declaratory relief for Defendants Rodney M. Bordeaux's and Wayne Boyd's  conduct taking place in Virginia including an order that they divest themselves of any interest, direct or indirect, in the Enterprise; imposing reasonable restrictions on the future activities of REDCO and Rosebud Lending, including, but not limited to, prohibiting them from engaging in the collection of unlawful debt in Virginia; and ordering dissolution or reorganization of Rosebud Lending.

22

## SECOND CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(c)-(d)
### (On behalf of all Plaintiffs and the RICO Class)
### (Class Claims against Defendant Wizipan Little Elk, *in his individual capacity*; Defendant Clay Colombe, *in his individual capacity*; and Defendant Mindi Vavra, *in her individual capacity; and John Does Nos. 1-30*)

132.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

133.    Defendants Wizipan Little Elk, Clay Colombe, and Mindi Vavra are each being sued in their individual capacities for their own conduct violating RICO, 18 U.S.C. § 1962(c) and (d).

134.    Plaintiffs also assert this count against Defendant John Doe Nos. 1-30 who are unidentified parties who participated in the enterprise with the Defendants.

135.    Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

136.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

137.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

138.    All of the loans made to RICO Class members and collected by Defendants included interest rates far in excess of twice the enforceable rate in their states.

139.    Rosebud Lending holds itself as wholly owned, operated, and controlled by REDCO, an arm and instrumentality of the Rosebud Sioux Tribe.

140.    As Chief Executive Officer of REDCO, Defendant Wizipan Little Elk is involved in overseeing Rosebud Lending and its operations and has participated in the operation or management of the enterprise involved in the collection of unlawful debt.

141. Defendant Clay Colombe, the Chief Financial Officer of REDCO, is responsible for overseeing Rosebud Lending and has participated in the operation or management of the enterprise involved in the collection of unlawful debt.

142. As the Rosebud Lending General Manager, Defendant Mindi Vavra is responsible for the daily operations of Rosebud Lending and has participated in the operation or management of the enterprise involved in the collection of unlawful debt.

143. Additionally, Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

144. Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

145. Defendants' unlawful conduct continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

146. Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

147. Additionally, Defendants seek injunctive relief against Defendants Wizipan Little Elk, Clay Colombe, and Mindi Vavra, prohibiting them from continuing to engage in the collection of unlawful debt and the conspiracy to violate RICO in violation 18 U.S.C. § 1964(c) and (d).

**THIRD CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962(b), (d)**
**(On behalf of all Plaintiffs and the RICO Class)**
**(Class Claims against Defendant Fintech Financial and John Does Nos. 1-30)**

148.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

149.    As alleged above, Fintech Financial violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt.

150.    Fintech Financial participated in the collection of the unlawful debt as a principal by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

151.    Plaintiffs and the class members were injured as a result of Fintech Financial's violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for its investment and participation in the enterprise.

152.    As a result of Fintech Financial's violations of 18 U.S.C. § 1962(b), it is jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

153.    Fintech Financial also violated 18 U.S.C. § 1962(d), by conspiring to use the Enterprise to collect unlawful debt. Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

154.    Plaintiffs and the RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

155.    This unlawful conduct continues to date and will be repeated again and again in the future to the detriment of Virginia consumers.

156.    Accordingly, Fintech Financial is jointly and severally liable in their individual capacities to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

157.    Additionally, Defendants seek injunctive relief against Fintech Financial prohibiting it from continuing to invest in the collection of unlawful debt and the conspiracy to violate RICO in violation 18 U.S.C. § 1964(b) and (d).

### FOURTH CAUSE OF ACTION
### DECLARATORY JUDGMENT
#### (On behalf of all Plaintiffs and the RICO Class)

(Rodney M. Bordeaux, *in his official capacities* as President of the Rosebud Sioux Tribe and Vice-Chairman of the REDCO Board of Directors; Wayne Boyd, *in his official capacities* as Secretary of the Rosebud Sioux Tribe and Chairman of the REDCO Board of Directors)

158.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

159.    Virginia law requires all who engage in the business of making personal loans to be licensed.

160.    Rosebud Lending was not licensed to make loans in Virginia or any other state in the United States.

161.    Because the loans were made without the required license and charged excessive interest rates, the loans are null and void under Virginia law.

162.    Rosebud Lending continues collections efforts in Virginia to collect on the loans that are void under Virginia law.

163.    In addition to licensing violations, the Rosebud Lending loans violated the general usury laws of Virginia. *See* Va. Code § 6.2-305(A). Thus, the loans are also void pursuant to state usury laws.

164.    The loan agreements were violative of fundamental state public policy in Virginia.

165.    Further, the lending agreements used for Plaintiffs contained unconscionable choice of law, forum-selection, and delegation provisions that are void and unenforceable for public policy concerns.

166.    Virginia law applies to Plaintiffs' Rosebud Lending loans.

167.    Because of the triple digit interest rates charged on the loans, the debts are increasing in value substantially.

168.    Accordingly, Plaintiffs seek a determination as to their obligation to pay their outstanding debts with Rosebud Lending.

169.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

170.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

171.    Accordingly, Plaintiffs seek a declaratory judgment that they are not obligated to pay any principal or interest outstanding on the illegal loans.

## FIFTH CAUSE OF ACTION
### INJUNCTIVE RELIEF
(Rodney M. Bordeaux, *in his official capacities* as President of the Rosebud Sioux Tribe and Vice-Chairman of the REDCO Board of Directors; Wayne Boyd, *in his official capacities* as Secretary of the Rosebud Sioux Tribe and Chairman of the REDCO Board of Directors)

172.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

173.    As alleged herein, Plaintiffs have taken out Rosebud Lending loans, which they maintain were void ab initio because they violated their state's licensing and usury requirements in addition to violating the public policy of their states and using unconscionable terms.

174.    Because of the triple digit interest rates used by Rosebud Lending, any remaining balances on any class members' loans will result in significant liability as the interest accrues at an exorbitant rate.

175.    Rosebud Lending is owned by REDCO, which holds itself out as wholly owned by the Rosebud Sioux Tribe.

176.    Accordingly, Plaintiffs face irreparable harm if the Court does not grant injunctive relief against Rodney M. Bordeaux and Wayne Boyd.

177.    Further, Plaintiffs face ongoing harm absent relief because collection efforts are ongoing and will continue in the absence of relief. In addition, Plaintiffs face ongoing harm absent relief because loan information will be reported to credit reporting agencies.

178.    Accordingly, Plaintiffs seek injunctive relief prohibiting Rodney M. Bordeaux and Wayne Boyd  from continuing to allow the collection on the unlawful loans in Virginia, requiring Rodney M. Bordeaux and Wayne Boyd to forgive the loans and/or prevent Rosebud Lending from selling the unlawful loans to third-party debt collectors, and prohibiting Rodney M. Bordeaux and

Wayne Boyd from continuing to use Rosebud Lending to engage in unlicensed and unlawful lending in Virginia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that the loan agreements are void and that Plaintiffs and members of the putative class are not obligated to pay any outstanding balances on the loans;

C.    An Order providing for any and all injunctive relief the Court deems appropriate against Defendants Rodney M. Bordeaux and Wayne Boyd, in their official capacities, and against Defendants Wizipan Little Elk, Clay Colombe, Defendant Mindi Vavra, Fintech Financial, and John Does Nos. 1-30, in their individual capacities;

D.    An Order awarding monetary damages against Defendants Wizipan Little Elk, Clay Colombe, Defendant Mindi Vavra, Fintech Financial, and John Does Nos. 1-30 in their individual capacities, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

E.    An Order awarding treble damages against Defendants Wizipan Little Elk, Clay Colombe, Defendant Mindi Vavra, Fintech Financial, and John Does Nos. 1-30, in their individual capacities in accordance with proof and in an amount consistent with applicable precedent;

F.    An Order awarding interest at the maximum allowable legal rate against Defendants Wizipan Little Elk, Clay Colombe, Defendant Mindi Vavra, Fintech Financial, and John Does

Nos. 1-30, in their individual capacities on the foregoing sums;

G.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees against Defendants Wizipan Little Elk, Clay Colombe, Defendant Mindi Vavra, Fintech Financial, and John Does Nos. 1-30, in their individual capacities; and

H.      Such further relief as this Court may deem just and proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:____/s/ Andrew J. Guzzo_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiffs*